Clerk's Office
Filed Date: 3/29/2022

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW
YORK
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

\----------------------------------------------------------x

DAVID KAPPEN,

               Petitioner,

   -against-

EARL BELL, Superintendent, Clinton
Correctional Facility,

             Respondent.

\----------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
18-cv-05784 (CBA)

**AMON, United States District Judge:**

Petitioner David Kappen ("Kappen") brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (ECF Docket Entry ("D.E.") # 1 ("Pet.").) A New York state jury convicted Kappen of one count of Criminal Possession of a Controlled Substance in the First Degree (New York Penal Law ("Penal Law") § 220.21(1)) and one count of Criminal Possession of a Controlled Substance in the Third Degree (Penal Law § 220.16(1)). (D.E. # 10-7 ("Indictment") at 1; D.E. # 8-32 at 1149:8-15.) Kappen argues that: (i) his due process rights were violated by the State's knowing use of false testimony in his prosecution; (ii) his conviction at his second trial violated the Double Jeopardy Clause of the Fifth Amendment; (iii) the evidence at his second trial was legally insufficient to sustain his convictions; and (iv) the trial court's jury instructions were improper. (Pet. 5-9.) For the following reasons, Kappen's petition is DENIED.

## BACKGROUND

### I.    Kappen's First Trial

#### a.  Pre-Trial Proceedings

Before a Grand Jury on August 10, 2010, Nassau County Detective Patrick Carroll ("Carroll") testified[1] that he received a phone call from Detective Francis McNally ("McNally")

---

[1] The facts relayed in this section come from Carroll's testimony to the grand jury. As Kappen notes, not all of this testimony is perfectly consistent with later testimony at his two trials. Accordingly, I recite these facts only for the purpose of detailing Carroll's grand jury testimony.

in the Third Precinct at 6:00 a.m. on August 5, 2010. (August 10, 2010 Grand Jury Minutes ("GJ1") at 6:11-14.) McNally put him in contact with California Police Officer Travis Cotton ("Cotton"). (Id. at 6:18-7:1.) Cotton informed him that while he was conducting undercover surveillance at a California UPS store, he observed two men acting suspiciously in the store. (Id. at 7:3-14.) Cotton said he had heard the two men ask the clerk behind the counter how much it would cost to mail a television. (Id. at 7:14-16.) When the clerk asked the men how much the television weighed, the two men said they were not sure. (Id. at 7:16-17.) The two men then went outside, sat in their car for a couple of minutes, and then returned to the store with the television box. (Id. at 7:18-22.) Cotton told Carroll that his suspicions were raised because the television box indicated that the television weighed 23 pounds, but when the clerk weighed the box it weighed almost 30 pounds. (Id. at 7:25-8:5.) One of the men then gave the clerk a telephone number, and the clerk informed the man that the same number had been used to send packages to the same address before. (Id. at 8:10-14.) The man then gave the store clerk a different telephone number, which made Cotton even more suspicious of the transaction. (Id. at 8:15-17.) The clerk then asked the men why they would want to spend $115 shipping a $200 television, to which the men responded, "Don't worry about it. Just Ship it." (Id. at 8:18-24.) The men shipped the package to 574 Willis Avenue, Williston Park, New York. (Id. at 7:5-7, 8:24.)[2]

After the phone call with Cotton, Carroll went into the office and started tracking the UPS package that Cotton had described to him. (Id. at 9:11-16.) Cotton also ran a search on the name Leacock, the last name of the individual to whom the suspicious package was scheduled to be

---

[2] At this point in the Grand Jury proceedings, the prosecutor instructed the Grand Jury not to consider this conversation between Carroll and Cotton for the truth of the matter asserted but only with regards to Carroll's state of mind after the telephone call. (GJ1 8:25-9:6.)

shipped, which revealed that Leacock had been arrested seven times for prior drug possession and sale. (Id. at 9:17-23.) Carroll then went to the Auto Spa at 574 Willis Avenue. (Id. at 10:4-8.)

At approximately 10:25 a.m. that same day, a UPS truck pulled up to the Auto Spa and delivered the package, which was accepted by a man who put it behind the counter. (Id. at 10:12-21.) Shortly after the package was delivered, Auto Spa worker Jamie Denton ("Denton")[3] arrived at the store and, according to Carroll, started acting suspiciously. (Id. at 10:24-11:10.) At around 10:40 a.m., a burgundy 2010 Ford Taurus with Florida tags arrived at the Auto Spa. (Id. at 11:10-14.) Carroll later learned the driver was Trent Singleton ("Singleton"). (Id. at 13:9-11.) Denton spoke with Singleton, who then drove away from the Auto Spa and waited nearby. (Id. at 11:14-17.) Fifteen minutes later, a white 2006 Mercedes Benz arrived at the Auto Spa and started following the Taurus, at which point Carroll lost sight of the cars. (Id. at 11:18-24.) Carroll later learned that the Mercedes was driven by Kappen. (Id. at 13:19-21.) The Taurus later returned to the Auto Spa, and Denton directed it into the garage bay. (Id. at 12:7-24.) Denton placed the television box in the back seat of the Taurus, and Singleton drove away. (Id. at 13:3-8.) The Mercedes, still driven by Kappen, pulled out from a side street and followed the Taurus. (Id. at 11:13-15.)

Around ten minutes later, after losing the cars in traffic, Carroll's team found Kappen driving the white Mercedes with Singleton in the passenger seat. (Id. at 13:24-14:6.) Kappen and Singleton drove back to the Auto Spa, where they got out of the car and spoke with Denton. (Id. at 14:13-17.) The three men then approached Denton's white Jeep Cherokee, where Carroll observed Kappen remove what appeared to be a white brick of cocaine from the Jeep and hide it

---

[3] Carroll learned Denton's identity after the fact. (See GJ1 10:24.)

under his shirt. (Id. at 14:18-16:9.) Kappen and Singleton then got back into the white Mercedes, with Singleton driving. (Id. at 16:9-17:5.)

Carroll's team then surrounded the Mercedes, and Singleton crashed into one of the police vehicles. (Id. at 17:6-16.) Singleton drove toward Carroll at high-speed, and Carroll fired two shots at the vehicle. (Id. at 17:25-18:4.) Singleton then crashed into two more police cars before fleeing the scene with Kappen; the police team quickly followed. (Id. at 18:20-19:22.) While the team followed Singleton and Kappen in the Mercedes, Carroll arrested Denton. (Id. at 19:15-20.) The police later found the Mercedes unoccupied. (Id. at 19:24-20:3.) They found the Taurus in front of Kappen's home. (Id. at 20:4-9.) The police found the television box inside the Taurus's trunk and found approximately three pounds of cocaine inside of the box. (Id. at 20:11-21:3.)

Following the Grand Jury proceedings, Kappen was indicted for Criminal Possession of a Controlled Substance in the First, Third, and Seventh Degrees for knowingly possessing cocaine, both individually and under an acting-in-concert theory. (See Indictment.) Subsequently, Kappen moved to inspect the Grand Jury minutes, release the minutes, and dismiss the indictment. (D.E. # 10-3 at 1.) The trial court reviewed the minutes in camera and, on January 10, 2011, declined to release the minutes and denied the motion to dismiss the indictment on the three counts of Criminal Possession of a Controlled Substance in the First, Third, and Seventh degrees.[4] (Id.)

The court held a suppression hearing between May 5 and May 25, 2011. (D.E. # 8-27 ("Supp. Hr'g").) Kappen moved to suppress only drugs recovered from his house after the events discussed above. (D.E. # 10 ("Reply").) At the hearing, Carroll testified that he called Cotton "some time probably before ten a.m. because it's a three-hour time difference" and he "didn't want

---

[4]The Grand Jury also indicted Kappen for various charges related to attempted murder, attempted assault, attempted aggravated assault, reckless endangerment, criminal mischief, and criminal possession of a controlled substance related to the shipment of the cocaine. (Indictment.) The majority of these charges were dismissed by the trial court after inspecting the Grand Jury minutes. (D.E. # 10-3 at 3-4.)

4

to wake him up in the middle of the morning." (Supp. Hr'g 202:22-203:5.) He also testified that
he called Cotton from Willis Avenue, not from his home. (Id. at 239:23-24.)  On cross-
examination, Carroll admitted that his statement to the grand jury that he "[g]ot out of bed and
started [his] day" "based on [his] conversations with Investigator Cotton" was incorrect, and that
he had meant that he had spoken to a New Jersey state trooper, not Cotton, before leaving home.
(Id. at 241:17-242:9.)  Carroll also testified that, a month later, Cotton identified Kappen and
Singleton as the men at the California UPS. (Id. at 243:23-245:7.) Ultimately, the suppression
hearing ended with the State agreeing to dismiss the charges based on the drugs recovered from
Kappen's bedroom. (Id. at 305-06.)

Following the suppression hearing, Kappen moved to renew his motion to dismiss the
indictment on the grounds that Carroll's Grand Jury testimony, which he argued contained
inadmissible hearsay, inadmissible double hearsay, and impermissible testimony, undermined the
integrity of the Grand Jury proceedings. (D.E. # 10-4.)  The State maintained that Carroll's
testimony at the Grand Jury proceedings was not hearsay because it was admitted to show Carroll's
state of mind and explain the reasons for his actions. (Id.)  The court declined to dismiss the
charges of which Kappen was ultimately convicted. (D.E. # 10-7.)

**b.  The First Trial**

Represented by counsel, Kappen proceeded to a jury trial in October 2011 on one count of
Criminal Possession of a Controlled Substance in the First Degree and one count of Criminal
Possession of a Controlled Substance in the Third Degree. (D.E. # 8-29 ("1st Trial Tr.").) During
trial, Carroll testified about the events of August 5, 2010. (Id. at 194-291.)  California police
officers Joseph Paterson ("Paterson") and Cotton also testified about Kappen's participation in
shipping the television package from the UPS store in California and authenticated a video

5

recording from the UPS store that recorded those events. (Id. at 54-69, 70-121.) After viewing the videotape during Cotton's testimony, Kappen moved for a mistrial based on gaps in the recording, claiming that the video had been edited, and on the fact that Cotton and Paterson could not authenticate the video because it showed that "but for a very short amount of time, they were not in the store at all." (Id. at 124:5-6; see id. at 123:3-126:19.) The trial court denied the motion for a mistrial because Kappen had failed to timely object to the admission of the videotape and any defects in the video recording went only to the credibility of the evidence, not its admissibility. (Id. at 134:14-136:7.)

During Kappen's cross-examination of Cotton, Cotton testified that he received the call from Carroll at 12:30 p.m. PT. (Id. at 164:13-16.) He also testified that he was not in the UPS store for certain conversations he had testified about, (id. at 160-61), and that he did not enter the store until after Kappen and Singleton were already at the UPS counter, (id. at 176:9-12). After this cross-examination, Kappen renewed his application for a mistrial. (Id. at 201:13-14.) In light of Cotton's admissions, Kappen argued that Cotton could not have seen and heard all that he had testified to have seen and heard at the UPS store. (Id. at 201:16-208:16.) In the alternative, Kappen moved to strike those seven minutes and forty seconds of the video before Cotton entered the UPS store on the grounds that there was no proper foundation. (Id. at 207:13-14.) The court reserved its decision on the mistrial motion. (Id. at 208:16.)

At the close of testimony at the first trial, Kappen again renewed his motion for a mistrial based on what he classified as Cotton's "false testimony that was elicited by the prosecutors." (Id. at 450:3-5.) He also argued that the seven minutes and forty seconds of the video before Cotton entered should be struck, requiring a mistrial "because the prejudicial effect of that [video] can't be erased." (Id. at 457:10-14.) The trial court agreed with Kappen that the seven minutes and

forty seconds of the video had not been properly authenticated and precluded the entire videotape and any testimony regarding the tape from the trial. (Id. at 475:12, 480:8-18.) Having precluded the videotape, the trial court informed Kappen that if he "truly wants a mistrial, [he] can have a mistrial." (Id. at 480:19-21.) However, the court also warned Kappen that if he accepted a mistrial, "this case does not go away, they only get to retry it a second time." (Id. at 480:22-25.) Before accepting the mistrial, Kappen moved for a trial order of dismissal, arguing that without the video there was legally insufficient evidence to establish a case. (Id. at 481.) The trial court denied Kappen's motion for a trial order of dismissal at which point Kappen accepted a mistrial. (Id. at 482:1-2, 483:21-22.)

### c. Post-Trial Motions

Prior to the commencement of Kappen's second trial, he renewed his motion to dismiss the indictment, arguing that it was based on inadmissible hearsay and materially false testimony and was barred by double jeopardy. (D.E. # 10-9.) On January 24, 2012, the trial court denied the motion to dismiss the indictment on the hearsay and false testimony grounds. (D.E. # 10-12.) The trial court denied the double jeopardy motion on February 29, 2012. (Reply 25.)

## II.   Kappen's Second Trial

At Kappen's second trial, the testimony largely tracked that of the Grand Jury proceedings and the first trial. A few notable differences are described in detail here. First, at the second trial Barbara Anhaeuser ("Anhaeuser"), the owner of the California UPS store, testified and authenticated the videotape from the store that was stricken from the first trial. (D.E. # 8-30 ("2nd Trial Tr. Pt. 1") at 403-09.) During Anhaeuser's testimony it was revealed that the gaps in the video that prompted Kappen's first motion for a mistrial at the first trial were caused by motion sensor technology that only recorded when motion was detected. (Id. at 404-05.) Anhaeuser also

testified that on August 3, 2010, two men had entered the UPS store and shipped a television to Chechano Leacock at the Auto Spa address. (Id. at 421-22.) Anhaeuser testified that Kappen and Singleton were in the UPS store for more than seven minutes before Cotton and Patterson entered the store. (Id. at 459:14-460:8.)

At the second trial Cotton also testified about the events that had taken place at the UPS store. Cotton testified that although he was only in the UPS store for approximately twenty seconds, he observed the remainder of the transaction through the glass doors outside the store. (Id. at 564:14-565:12.) Cotton testified that he personally overheard some of the conversation about shipping the television—or at least that he wrote down in his report that he did and was recollecting with his report two years later. (Id. at 584:22-586:16.) After Singleton and Kappen had left the store, Cotton and Paterson reentered the store and inspected the television box before contacting East Coast law enforcement about the transaction. (Id. at 566, 577.)

Carroll testified about the events that had taken place on August 5, 2010. In contrast to his grand jury testimony, Carroll testified that he had not spoken to Officer Cotton until later in the day after he had left his house to go into the office. (Id. at 521:22-25.) He testified that he had made a mistake when testifying before the grand jury, and had meant to say that he spoke to a different officer before leaving the house. (Id. at 524:11-12.) Carroll testified that he spoke to numerous law enforcement officers throughout the day and could not be sure if he spoke to Cotton before or after 10 a.m., or before or after the television was delivered. (Id. at 530:15-531:1.) The remainder of Carroll's testimony largely tracked his earlier testimony.[5]

At the conclusion of the State's case, Kappen moved for a trial order of dismissal. (D.E. # 8-31 at 957:19-21.) Kappen argued that the State had failed to prove the necessary elements of

---

[5] At trial, there was no mention of the brick of cocaine that Carroll had testified in the grand jury he had seen in Kappen's possession before the arrest.

8

possession and knowledge of a controlled substance and that there was insufficient evidence to establish that he had aided Singleton in possessing the television box. (Id. at 958:2-5.) The trial court reserved decision on the motion. (Id. at 969:15-16.) Over Kappen's objection, (id. at 985-990, 1108-09), the trial court gave the jury an "expanded knowledge" charge: "the act of possession of property by a person permits the inference that such person knows what he or she possesses," (id. at 1103:25-1104:2). Ultimately, the jury found Kappen guilty of Criminal Possession of a Controlled Substance in the First and Third Degrees. (Id. at 1149:8-15.) The trial court denied Kappen's motion for a trial order of dismissal. (Id. at 1152:18-19.)

## III.    Post-Trial Procedural History

Kappen was sentenced on October 9, 2012 to concurrent prison terms of fifteen years and twelve years, followed by five years of post-release supervision. (D.E. # 8-28 at 25-26.) Kappen appealed his conviction to the Second Department, where he raised five arguments: (i) the integrity of the grand jury had been impaired because of the admission of false, hearsay testimony; (ii) his second trial was barred by double jeopardy because the evidence at his first trial, which had ended in a mistrial, was legally insufficient to prove his guilt; (iii) the evidence at his second trial was legally insufficient; (iv) the trial court's jury instruction on the expanded knowledge charge was improper; and (v) the trial court failed to conduct an adequate inquiry into a juror's alleged inability to participate in deliberations. (D.E. # 8-1.) On September 21, 2016, a unanimous panel of the Appellate Division upheld Kappen's judgment of conviction. People v. Kappen, 38 N.Y.S.3d 215 (App. Div. 2016). On October 21, 2016, Kappen sought leave to appeal to the Court of Appeals. (D.E. # 8-14.) The Court of Appeals denied leave on February 8, 2017. People v. Kappen, 75 N.E.3d 104 (N.Y. 2017). Kappen did not seek a writ of certiorari from the United States Supreme Court. (Pet. 2.)

9

On April 2, 2018, Kappen moved pro se to vacate the judgment against him pursuant to section 440.10 of the New York Criminal Procedure Law. (D.E. # 18; D.E. # 19; D.E. # 20.) In that motion, Kappen argued that: "(1) the judge who presided over defendant's first trial lacked the legal authority to do so . . . ; and (2) the People gave an incomplete and misleading instruction to the grand jury regarding the law on 'acting in concert' with respect to various charges." (Pet. 3.) On July 17, 2018, the Nassau County Court denied Kappen's motion to vacate. (D.E. # 8-26.) On October 4, 2018, the Appellate Division denied Kappen's leave application. (D.E. #8-13.) The present petition followed.[6]

## STANDARD OF REVIEW

A federal court may grant habeas relief to a state prisoner only for violations of federal law. 28 U.S.C. § 2254(a). As an initial, procedural prerequisite to attaining federal habeas relief, "a state prisoner is required to exhaust all of his available state remedies before a federal court can consider his habeas application." Jackson v. Conway, 763 F.3d 115, 133 (2d Cir. 2014) (citing 28 U.S.C. § 2254(b)(1)(A)). This means that, for federal habeas relief to be available, the prisoner must have "'present[ed] the essential factual and legal premises of his federal constitutional claim to the highest state court capable of reviewing it' . . . 'in terms that are likely to alert the state courts to the claim's federal nature.'" Id. (first quoting Rosa v. McCray, 396 F.3d 210, 217 (2d Cir. 2005); and then quoting Carvajal v. Artus, 633 F.3d 95, 104 (2d Cir. 2011)).

Where a state prisoner has exhausted all state remedies, a federal court may consider whether habeas relief is merited. A federal court may grant relief where a state court adjudicated the habeas petitioner's federal claim "on the merits" only where that adjudication was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by

---

[6] Kappen filed his petition for a writ of habeas corpus without a memorandum of law in support of the petition. (See Pet.)

the Supreme Court of the United States" or was "based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d). This standard is "difficult to meet." Harrington v. Richter, 562 U.S. 86, 102 (2011). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Id. at 101 (internal quotation marks and citation omitted). What is reasonable disagreement "depend[s] in part on the nature of the relevant rule." Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). "The more general the rule, the more leeway [state] courts have in reaching outcomes in case-by-case determinations" because "[a]pplying a general standard to a specific case can demand a substantial element of judgment." Id. In essence, a court "will not lightly conclude that a State's criminal justice system has experienced the 'extreme malfunctio[n]' for which federal habeas relief is the remedy." Burt v. Titlow, 571 U.S. 12, 20 (2013) (alteration in original) (quoting Harrington, 562 U.S. at 102).

## DISCUSSION

### I.     False Testimony

Kappen argues that his conviction was based on perjured testimony in violation of his due process rights, and that the state court's determination otherwise was (1) contrary to Napue v. Illinois, 360 U.S. 264 (1959) and (2) an unreasonable determination of facts in light of the record. (Reply 34.) Specifically, he argues that the prosecution knowingly put forward false testimony before the grand jury, during his suppression hearing, and at trial.[7]

---

[7] In addition to arguing that Kappen's claims fail on the merits, the State argues that they are procedurally defaulted. Because I find that Kappen's claims fail on the merits, I "need not consider these procedural arguments." Nieblas v. Smith, 204 F.3d 29, 31 (2d Cir. 1999); see 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

"[T]he [Supreme] Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103 (1976). The Second Circuit has explained that I must consider "(1) whether false testimony was introduced, (2) whether that testimony either was or should have been known to the prosecution to be false, (3) whether the testimony went uncorrected, and (4) whether the false testimony was prejudicial in the sense defined by the Supreme Court in Agurs." Shih Wei Su v. Filion, 335 F.3d 119, 127 (2d Cir. 2003).

False testimony before the grand jury alone is insufficient to state a cognizable claim for habeas review if the petit jury convicts without relying on false testimony. In Lopez v. Riley, 865 F.2d 30 (2d Cir. 1989), the Second Circuit ruled that errors in a state grand jury proceeding were not cognizable in federal habeas proceedings where any harm was cured by the petit jury's conviction. Id. at 32. There, Lopez complained of "the presentation of prejudicial evidence and error in explaining the law," and the Second Circuit found that, where the petit jury later convicted, "error before the grand jury, if any, was harmless." Id. at 33. District courts in this circuit have extended Lopez directly to claims of false testimony provided to the grand jury, denying habeas relief based on knowing presentation of false information to the grand jury. See, e.g., Smith v. Hulihan, No. 11-cv-2947 (HB) (AJP), 2011 WL 4058764, at *10 (S.D.N.Y. Sept. 13, 2011), report and recommendation adopted, 2012 WL 4928904 (S.D.N.Y. Oct. 17, 2012); May v. Warden, No. 7-cv-2176 (BSJ) (GWG), 2010 WL 1904327, at *3 (S.D.N.Y. May 10, 2010).

Kappen does not dispute that a claim based solely on false testimony given to the grand jury is not cognizable on federal habeas review. Instead, he argues that the false testimony infected the entirety of the proceeding such that he was not just indicted but also convicted based on the

false testimony. In other words, he admits that his grand jury claim only survives if his petit jury claim survives. His petit jury claims are discussed below; any claims based solely on false testimony before the grand jury are denied.

Similarly, any claims regarding false testimony during the suppression hearing are not grounds for habeas relief because they were immaterial to the jury's verdict in the second trial. Kappen claims that the suppression hearing held between May 5, 2011 and May 25, 2011 was "outcome determinative." (Reply 31.) However, Kappen admits that he moved to suppress only drugs recovered from his house, and that those drugs were related only to charges that the State agreed to dismiss before trial. (Id. at 12 n.10.) He also admits that he "did not have standing to challenge the recovery of the cocaine from the TV" and that "the guilty pleas of his co-defendants rendered the Fourth Amendment challenge to the search of the TV box moot." (Id.) Any false testimony at the suppression hearing, then, is unrelated to evidence that was actually heard at trial. Accordingly, there is no "reasonable likelihood that [any] false testimony" at the suppression hearing "could have affected the judgment of the jury" at trial. See Agurs, 427 U.S. at 103.

Finally, Kappen has failed to prove that false testimony was introduced at his second trial. False testimony may be "distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory." Black v. Rock, 103 F. Supp. 3d 305, 317 (E.D.N.Y. 2015) (quoting McCants v. Hallenback, No. 13-cv-5587 (JFB), 2014 WL 4638836, at *6 (E.D.N.Y. Sept. 16, 2014) (Bianco, J.)). "[E]ven a direct conflict in testimony does not in itself constitute perjury." United States v. Gambino, 59 F.3d 353, 365 (2d Cir. 1995).

Kappen argues that Carroll's testimony as to the time of his call with Cotton was false. At the second trial, Carroll testified that he had not spoken to Cotton until he had left his house to go into the office. (2nd Trial Tr. Pt. 1 at 521:22-25.) This was inconsistent with his statement to the

13

grand jury that he went into the office after his phone call with Cotton. (Id. at 9:11-16.) At the second trial, he testified that he had made a mistake when testifying before the grand jury and had meant to say that he spoke to a different officer before leaving the house. (Id. at 524:11-12.) Carroll testified that he spoke to numerous law enforcement officers throughout the day and could not be sure if he spoke to Cotton before or after 10 a.m., or before or after the television was delivered. (Id. at 530:15-531:1.) Accordingly, Carroll's allegedly false statement, that he spoke with Cotton before he left the house, was not put before the petit jury that convicted Kappen. Instead, at worst, Carroll's testimony at the second trial was inconsistent with his earlier testimony. Cf. Gambino, 59 F.3d at 365 ("[E]ven a direct conflict in testimony does not in itself constitute perjury.").

Kappen also argues that Cotton's testimony regarding what he witnessed in California was false. According to Kappen:

> The videotape from the UPS store demonstrated that Cotton and Patterson did not enter the store until nearly eight minutes after the shipping transaction began, thus Cotton never overheard Petitioner and Singleton ask how much it would cost to mail the TV, and he likewise did not observe Petitioner or Singleton go to their car, take out a TV box, carry the box into the store, or put the box on the counter

(Reply 42.) On direct examination at the second trial, Cotton testified that he was in the UPS store for only twenty seconds. (2nd Trial Tr. Pt. 1 at 564:14-16.) He stated that the rest of the time he was outside the store and could see inside through the store's glass doors. (Id. at 564:17-565:5.) He testified to seeing a negotiation, and to seeing an exchange of money for the shipment of a flat screen television. (Id. at 562:2-566:6.) He testified that he spoke to the store clerk about the shipment. (Id. at 574:3-14.) Kappen offers no proof that this testimony is false, other than arguing that it was inconsistent with prior testimony. Moreover, the UPS store clerk testified that the officers watched the transaction. (Id. at 433:5.) This testimony on direct examination would allow a jury to infer that Cotton did visually witness the actions that Kappen says he could not have seen.

Moreover, the store clerk's testimony about her conversations with Kappen and Singleton support the proposition that the conversation about the cost of mailing the television occurred. (See, e.g., id. at 434:20-435:6.) Accordingly, Kappen has failed to prove that that portion of Cotton's testimony is false.

Kappen also argues that Cotton made false statements regarding what he heard. In contrast to his testimony at earlier proceedings, Cotton did not testify that he overheard Kappen and Singleton's conversation about shipping the television on direct examination. Testimony about overheard conversations was first elicited on cross-examination. Kappen's counsel questioned Cotton about the police report he submitted, which stated that he overheard certain conversations. (See id. at 584:22-25.) Cotton's testimony on cross-examination was unclear as to whether he overheard portions of the UPS conversation himself. He equivocated, stating that his police report said he overheard conversations rather than saying that he did indeed hear them. (See id. at 585:5-10 ("Q. So you actually heard the discussion of whether or not the item was going to be shipped overnight or three-days select? A. My report says I overheard it. Q. Did you actually overhear it? A. I'm just referring to my report.").) After some back and forth, he eventually stated "[a]ll I did was write down in my report that I overheard it. That must mean that I overheard it," (id. at 585:23-24), and that "I wouldn't write it down if it didn't occur," (id. at 586:2). Even this statement, however, was followed up by more hedging, and his statement that "[t]his occurred over two years ago, so all I am doing is recollecting with my report. (Id. at 586:21-22.) And when Cotton later testified that he was not in the store during certain conversations, and counsel asked "[w]ouldn't you have had to have been to overhear the conversation," Cotton answered "yes," undermining any testimony that he had heard the conversations. (Id. at 587:1-9.)

15

Although Cotton's testimony appears to "result[] from confusion, mistake, or faulty memory," that is distinct from it being false. Black, 103 F. Supp. 3d at 317. Read as a whole, Cotton's testimony would indicate to a jury that he was not sure what he had overheard, and that his memory of the event two years prior was foggy. His half-hearted support of his police report, when coupled with his equivocation and his admission that he could not have heard certain information, does not qualify as false testimony. Instead, Kappen's decision to attempt to impeach Cotton through his prior statements is an attack on Cotton's credibility that the jury could consider for itself. See United States v. Bortnovsky, 879 F.2d 30, 33 (2d Cir. 1989) ("Presentation of a witness who recants or contradicts his prior testimony is not to be confused with . . . perjury. It was for the jury to decide whether or not to credit the witness." (quoting United States v. Holladay, 566 F.2d 1018, 1019 (5th Cir. 1978) (per curiam))).

To the extent that Cotton's testimony about what he overheard was false, there is no "reasonable likelihood that the false testimony could have affected the judgment of the jury." Agurs, 427 U.S. at 103. The only debatably false testimony goes to what specific conversations Cotton overheard. The portions of his story about what he witnessed, however, remain constant. The UPS store clerk's testimony, placing Kappen and Singleton at the store, describing her conversations with them, and corroborating the fact that Cotton watched the transaction, support the veracity of the rest of Cotton's testimony. Moreover, the State's version of events is bolstered by the surveillance video placing Kappen in California and showing him ship a television. The State did not need to rely on any conversations Cotton overheard to prove its case. Notably, it did not elicit testimony about these conversations on direct or discuss them in summation. Accordingly, it would have been unreasonable for the jury to change its verdict based on whether Cotton personally overheard a certain conversation. Moreover, any false statements would have

16

been unlikely to strongly alter a jury's balancing of Cotton's credibility after his equivocal testimony. See Harripersaud v. Barkley, No. 04-cv-4035 (NGG) (KAM), 2006 WL 467951, at *14 (E.D.N.Y. Feb. 27, 2006) (finding lack of prejudice on credibility grounds from allegedly false testimony where witness's "credibility was in fact impeached at trial with the facts underlying the adjudication"). In any case, Cotton's testimony was at best tangential and cumulative given the surveillance video, and so it is unlikely that a juror's credibility determination would have altered the verdict.

Accordingly, Kappen's motion on this ground is DENIED.

## II.    Double Jeopardy

Kappen argues that the state court's decision rejecting his double jeopardy claim was an unreasonable application of United States v. Scott, 437 U.S. 82 (1978). In Scott, the Supreme Court held that where "a defendant successfully seeks to avoid his trial prior to its conclusion by a motion for mistrial, the Double Jeopardy Clause is not offended by a second prosecution." Id. at 93. Kappen argues that the Appellate Division was wrong to apply that holding to his case because he sought a mistrial only after the trial court improperly denied his motion for a trial order of dismissal.

Because the Appellate Division's application of federal law on double jeopardy was not unreasonable, I need not consider whether Kappen's motion for a trial order of dismissal was improperly denied.[8] Kappen argues that on direct appeal the Appellate Division unreasonably applied Scott when it held that Kappen waived any claim that his second trial constituted double jeopardy because he sought and obtained a mistrial himself. "The Double Jeopardy Clause of the

---

[8] Kappen does not argue that the insufficiency of the evidence at his first trial is, on its own, sufficient to justify habeas relief in light of the jury's guilty verdict at his second trial. In any event, "the protection of the Due Process Clause focuses on conviction, not retrial." United States v. Brack, 747 F.2d 1142, 1148 (7th Cir. 1984).

Fifth Amendment protects a defendant in a criminal proceeding against . . . repeated prosecutions for the same offense." United States v. Dinitz, 424 U.S. 600, 606 (1976). Whether the Double Jeopardy Clause bars further prosecution in a particular case depends on the outcome of an earlier proceeding. For example, "[t]he successful appeal of a judgment of conviction, on any ground other than the insufficiency of the evidence to support the verdict poses no bar to further prosecution on the same charge." Scott, 437 U.S. at 90-91. On the other hand, a "judgment of acquittal, whether based on a jury verdict of not guilty or on a ruling by the court that the evidence is insufficient to convict, may not be appealed and terminates the prosecution when a second trial would be necessitated by a reversal." Id. at 91.

In Scott, the Supreme Court considered whether double jeopardy bars further prosecution after a defendant-initiated mistrial. The Court ruled that where "a defendant successfully seeks to avoid his trial prior to its conclusion by a motion for mistrial, the Double Jeopardy Clause is not offended by a second prosecution." Id. at 93. "[A] motion by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution, even if the defendant's motion is necessitated by a prosecutorial or judicial error." Id. (quoting United States v. Jorn, 400 U.S. 470, 485 (1971) (opinion of Harlan, J.)). The Scott Court acknowledged that a narrow exception applies where "governmental actions [are] intended to provoke mistrial requests and thereby to subject defendants to the substantial burdens imposed by multiple prosecution." Id. at 94 (quoting Dinitz, 424 U.S. at 611). Later decisions have clarified that this exception requires proof that "the governmental conduct in question [was] intended to 'goad' the defendant into moving for a mistrial." Oregon v. Kennedy, 456 U.S. 667, 676 (1982).

On direct appeal, the Appellate Division explicitly relied on Scott for the holding that "since the defendant himself sought and obtained a mistrial without prejudice, he waived his

18

present claim that the second trial constituted double jeopardy." People v. Kappen, 38 N.Y.S.3d 215, 216 (App. Div. 2016). That finding was presumably premised on the undisputed fact that Kappen requested a mistrial several times throughout his first trial. (See 1st Trial Tr. 88:4, 89:22, 123:6-7, 201, 448:13, 450:3-5.) The trial court warned Kappen that if he truly wanted a mistrial, he could get a mistrial, but that "if I grant a mistrial, this case does not go away, they only get to retry it a second time." (Id. at 480:19-25.) Even after the trial court's warning, Kappen still proceeded to accept the mistrial after the trial court denied his motion for a trial order of dismissal. (Id. at 482:1-4, 483:21.)

Kappen argues that Scott's holding that a trial ending in a defendant-sought mistrial does not bar further prosecution does not apply where the defendant sought mistrial after a motion for judgment of acquittal for insufficient evidence was wrongfully denied. To be entitled to habeas relief on this ground, he must prove that the Appellate Division's application of Scott was "unreasonable"—in other words, he must prove that the Appellate Division committed an "error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011). In other words, even an incorrect application by the state court, if not unreasonable, will not justify habeas relief. See id. at 785.

Kappen argues that Scott, as augmented by Burks v. United States, 437 U.S. 1 (1978), and numerous state cases applying these principles, clearly does not apply after the denial of a meritorious trial order of dismissal. In Burks, the Supreme Court held that double jeopardy precludes a second trial after an appellate court finds that there was insufficient evidence to sustain a jury's conviction. Id. at 11. Accordingly, Kappen argues that "there is no sound reason, based in law or in equity, why the considerations that precluded Petitioner from taking an interlocutory appeal from the trial court's denial of his motion for a judgment of acquittal at his first trial,"

19

which, had he won, would have triggered double jeopardy, "should now also preclude him seeking relief in this Court." (Reply 66.)

Kappen's argument is directly refuted by the Supreme Court's decision in United States v. Richardson, 468 U.S. 317 (1984). In Richardson, the defendant moved for a judgment of acquittal as a matter of law. Id. at 318. After the trial court denied that motion, the jury was unable to reach a verdict on certain counts of the indictment, and the court ordered a mistrial. Id. at 319. After trial, Richardson moved to renew his motion for a judgment of acquittal as a matter of law and to bar a second trial on double jeopardy grounds. Id. The district court denied these motions, and Richardson appealed. Id. The question reached the Supreme Court after the D.C. Circuit denied the appeal for lack of jurisdiction. Id. Although the Supreme Court held that "a colorable double jeopardy claim [is] appealable," it rejected Richardson's claim. Id. at 322. Discussing Richardson's reliance on Burks, the Court refused to "extend[] the reasoning of Burks, which arose out of an appellate finding of insufficiency of evidence to convict following a jury verdict of guilty, to a situation where the jury is unable to agree on a verdict." Id. at 324. The Court noted that "the protection of the Double Jeopardy Clause by its terms applies only if there has been some event, such as an acquittal, which terminates the original jeopardy" but that a mistrial "is not an event which terminates jeopardy." Id. at 325. Accordingly, whether or not the trial court should have granted the motion for a judgment of acquittal as a matter of law, "[r]egardless of the sufficiency of the evidence at petitioner's first trial, he has no valid double jeopardy claim to prevent his retrial." Id. at 326.

As other district courts have noted, Richardson "held quite clearly that jeopardy does not terminate solely because the prosecution presents insufficient evidence at trial. In order to bar a retrial, insufficient evidence must, according to the Court, result in an actual acquittal by jury or a

judgment of acquittal on insufficiency ground by the trial or appellate court." Sivri v. Strange, 338 F. Supp. 2d 357, 362 (D. Conn. 2004). Here, Kappen points to no event that terminated jeopardy. Accordingly, under Richardson, he was not entitled to a double jeopardy bar even if the evidence at his first trial were insufficient.

Furthermore, there is no evidence or even argument that the prosecution goaded Kappen into requesting and accepting a mistrial in the present case. Although Kappen argues that he moved for a mistrial only "at the clear provocation of the court," (Reply 67), he points to no evidence that the judiciary or the prosecution made decisions with the "inten[t] to 'goad' the defendant into moving for a mistrial," Kennedy, 456 U.S. at 676, especially where Kappen moved for mistrial multiple times throughout trial and the judge warned him of the implications of moving for a mistrial. Considering these facts, the Appellate Division did not unreasonably apply clearly established law in holding that Kappen's second trial was not barred by double jeopardy. Because Kappen has failed to show that the state court made an objectively unreasonable determination, he is not entitled to habeas relief on this claim.

**III.    Insufficient Evidence at Second Trial**

Kappen argues that the state court erred in its determination that the evidence at his second trial was legally sufficient. In the § 2254 context, a sufficiency of the evidence challenge is judged under a "twice-deferential" standard. Santone v. Fischer, 689 F.3d 138, 148 (2d Cir. 2012). In Jackson v. Virginia, 443 U.S. 307 (1979), the Supreme Court held that evidence is constitutionally sufficient if "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id. at 319. "And a state-court decision rejecting a sufficiency challenge may not be overturned on federal habeas unless the 'decision was "objectively unreasonable.""" Parker v.

Matthews, 567 U.S. 37, 43 (2012) (quoting Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam)). Putting these two standards together, I can only overturn the New York courts' sufficiency finding if it is objectively unreasonable to believe that any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

First, Kappen argues that the evidence at his second trial was only sufficient to infer possession in California, and that evidence of possession in California is insufficient to establish possession in New York. However, viewing the evidence in the light most favorable to the prosecution, it was sufficient to prove constructive possession. First, because the entire videotape was admitted at the second trial, the jury was able to consider the events inside the UPS store where Kappen was seen shipping the television with Singleton. Following the events at the UPS store, Kappen arrived in New York only a few days later at the same location where the television was delivered. Once Kappen was at the Auto Spa, law enforcement officials observed Kappen following Singleton in his car. Kappen was also seen driving in his own car with Singleton multiple times. The television with the cocaine was found in a car on the street directly outside of Kappen's home that very same day. This evidence supports the Appellate Division's conclusion that a rational juror could have found that Kappen exercised the necessary level of control over over the television with the cocaine to establish constructive possession in New York, or at the very least to support an inference that he aided Singleton in possessing the cocaine in New York. The Appellate Division's decision was not an arbitrary application of New York law nor did anything in the federal Constitution prevent the Appellate Division from reaching this conclusion. As a result, Kappen cannot show that it was objectively unreasonable for the Appellate Division to conclude that a rational trier of fact could have found him guilty.

Second, Kappen argues that the evidence at his second trial was insufficient to establish that he knew the television contained cocaine. In making this argument Kappen relies on United States v. Torres, 604 F.3d 58 (2d Cir. 2010). There, the Second Circuit held that the evidence was insufficient to permit a jury to find beyond a reasonable doubt that the defendant had the requisite knowledge and intent to support a conviction for conspiring to distribute and possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846, because there was insufficient evidence to establish that the defendant knew a package contained cocaine. Id. at 70. The only evidence of the defendant's contact with a cocaine-laden package was his receipt of the package. Id. The Second Circuit distinguished the facts in Torres from its prior holding in United States v. Huezo, 546 F.3d 174 (2d Cir. 2008), because "the government presented no evidence as to the nature of Torres's associations with the persons who shipped the cocaine." Torres, 604 F.3d at 71. Moreover, "'[t]here was no evidence of any conduct by Torres other than his efforts to gain possession of the Packages, which . . . did not show that he had knowledge of the Packages' contents,' and the defendant was never in a position to have 'sole dominion' over the narcotics." United States v. Serrano, 224 F. Supp. 3d 248, 254 (S.D.N.Y. 2016) (alterations in original) (quoting Torres, 604 F.3d at 71).

In contrast, Kappen was the person who shipped the cocaine, as evidenced by the UPS store video. In fact, the UPS store clerk testified that Kappen was the one who conducted the bulk of the transaction and signed all of the documents. (See 2nd Trial Tr. Pt. 1 at 418:23-419:1, 424:24-425:2.) His participation in both sides of a cross-country drug delivery would support the inference that he was aware of the details of that delivery. Torres, 604 F.3d at 71; Huezo, 546 F.3d at 182. Moreover, unlike in Torres, there is evidence that Kappen had the "prospect[] of having sole dominion over the Packages," Torres, 604 F.3d at 71—after all, the television box was eventually

23

found in a car parked at his house. "It is reasonable to infer that whoever entrusted [Kappen] with this valuable package would have acquainted him with the nature of its contents." United States v. Bulluck, No. 09-cr-652 (PGG), 2011 WL 2360283, at *5 (S.D.N.Y. June 8, 2011) (citing Huezo, 546 F.3d at 182); see also United States v. Anderson, 747 F.3d 51, 70 (2d Cir. 2014) (finding knowledge even where "the facts adduced in Huezo regarding the nature of the relationship between the defendant and his co-conspirators were more extensive than those produced by the government here" because "although the government is not permitted to build a conviction on a house of cards, neither is a jury required to leave its common sense at the courthouse door").

In any event, Torres, a federal case analyzing federal law, has little relevance in determining whether evidence was sufficient under state law to convict Kappen of a state crime. "When considering the sufficiency of the evidence of a state conviction, '[a] federal court must look to state law to determine the elements of the crime.'" Ponnapula v. Spitzer, 297 F.3d 172, 179 (2d Cir. 2002) (quoting Quartararo v. Hanslmaier, 186 F.3d 91, 97 (2d Cir. 1999)). Accordingly, I must consider how New York courts have construed the knowledge element.

Under New York law, there is sufficient evidence for a rational juror to find that Kappen knew that the television contained cocaine. Under New York law, "possession suffices to permit the inference that the possessor knows what he possesses, especially, but not exclusively, if it is in his hands, on his person, in his vehicle, or on his premises." People v. Reisman, 29 N.Y.2d 278, 285 (1971). In the present case, Kappen shipped the television box at the UPS store in California in a suspicious manner, arrived in New York at the Auto Spa only a few days later just in time for the delivery of the television, followed Singleton who was driving the Taurus with the television in the trunk, and drove in the Mercedes with Singleton. Finally, the television with the cocaine was discovered in the Taurus directly outside his home. Under New York law, these facts are

24

more than enough to support the inference that Kappen knew the television contained cocaine. See, e.g., People v. McCullough, 890 N.Y.S.2d 489, 489 (App. Div. 2009) (rejecting argument that defendant did not know boxes contained marijuana because "defendant was the intended recipient of the boxes" and "when a detective subsequently approached and identified himself, defendant immediately disclaimed ownership of the boxes"); People v. Gonzalez, 779 N.Y.S.2d 192, 193 (App. Div. 2004) (rejecting argument that defendant did not know cocaine was in boxes where "defendant had the package delivered to himself under an assumed name, to a warehouse where he stood outside awaiting delivery"). The Appellate Division's determination that there was sufficient evidence for a rational juror to infer Kappen's knowledge under New York law was not objectively unreasonable, and Kappen is not entitled to habeas relief on his sufficiency of the evidence challenge.

## IV.    Jury Instruction

Kappen argues that the trial court erred in instructing the jury that it could infer knowledge from constructive possession. "In order to obtain a writ of habeas corpus in federal court on the ground of error in a state court's instructions to the jury on matters of state law, the petitioner must show not only that the instruction misstated state law but also that the error violated a right guaranteed to him by federal law." Casillas v. Scully, 769 F.2d 60, 63 (2d Cir. 1985). "The question is not whether the trial court gave a faulty instruction, but rather 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" Davis v. Strack, 270 F.3d 111, 123 (2d Cir. 2001) (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)). "In a criminal trial, the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement." Middleton v. McNeil, 541 U.S. 433, 437 (2004). Where the petitioner challenges a jury instruction informing jurors of

a permissive inference they may make, "it affects the application of the 'beyond a reasonable doubt' standard only if, under the facts of the case, there is no rational way the trier could make the connection permitted by the inference." Cnty. Ct. v. Allen, 442 U.S. 140, 157 (1979).

Here, the trial court gave an expanded knowledge charge to the jury at Kappen's second trial. The trial court first explained to the jury that under New York law possession can be proven one of two ways. First, a person may physically possess property. Second, a person may constructively possess property by exercising the necessary level of control or dominion over the property. The court then explained that a defendant demonstrates dominion and control when they exercise a level of control over the area in which the property is found, or over the person from whom the property is seized, sufficient to give the defendant the ability to use or dispose of the property. The trial court finally instructed the jury that if they found that possession was proven beyond a reasonable doubt, they were permitted, but not required, to infer that Kappen knew what he possessed was cocaine.

The Appellate Division held that the expanded knowledge charge that the trial court gave was proper. See People v. Kappen, 38 N.Y.S.3d 215, 216 (App. Div. 2016). The Appellate Division held that the even though the evidence of Kappen's guilt was circumstantial and his possession of cocaine was accessorial and constructive, this was not a bar to the expanded knowledge charge. Id.

The trial court's jury instructions did not misstate New York law regarding knowing possession. First, the court's constructive possession and expanded knowledge charges correctly stated state law—both tracked the New York Pattern Jury Instructions. See New York Criminal Jury Instructions and Model Colloquies, General Applicability, Possession, Physical and Constructive Possession; New York Criminal Jury Instructions and Model Colloquies, General

Applicability, Culpable Mental States, Expanded Charge on Knowingly; see also Sams v. Walker, 18 F.3d 167, 171 (2d Cir. 1994) (finding "trial judge correctly instructed the jury" where "the court's instructions faithfully tracked the language of New York's pattern criminal jury instructions"); cf. Middleton, 541 U.S. at 435 (discussing correctness of jury instruction under state law by reference to model jury instructions). To the extent Kappen argues that the error was in issuing both charges together, that double inference is permitted under state law. As discussed regarding sufficiency, under New York law "possession suffices to permit the inference that the possessor knows what he possesses, especially but not exclusively, if it is in his hands, on his person, or in his vehicle, or on his premises." People v. Reisman, 29 N.Y.2d 278, 285 (1971). Notably, Reisman does not suggest that the inference of knowledge is permissible only in cases of physical possession as opposed to constructive possession. Id. (discussing possession "especially but not exclusively . . . in his vehicle, or on his premises").

Because Kappen has failed to prove that the jury instructions misstated state law, and he has failed to prove that the state law inferences violate his due process rights, his habeas petition is DENIED.

## CONCLUSION

For the reasons set forth above, Kappen's petition is denied. Because Kappen has failed to make a "substantial showing of the denial of a constitutional right," a Certificate of Appealability shall not issue. 28 U.S.C. § 2253(c). The Clerk of Court is respectfully directed to enter judgment accordingly and close the case.

SO ORDERED.

Dated: March 28, 2022
        Brooklyn, New York

s/Carol Bagley Amon

Carol Bagley Amon
United States District Judge

27